2026 IL App (1st) 250666-U

No. 1-25-0666

First Division
June 30, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MATTHEW FRANKENFELD, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 24 CH 07335 |
| THRIVE PHYSICAL THERAPY | ) | |
| PARTNERS, LLC, THRIVE PHYSICAL | ) | |
| THERAPY PARTNERS HOLDINGS, LLC | ) | |
| and TYREE & D'ANGELO PARTNERS, | ) | Honorable |
| LLC, | ) | Caroline Kate Moreland |
| | ) | Judge, Presiding. |
| Defendants-Appellees. | ) | |
| | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's dismissal of plaintiff's complaint for declaratory judgment and specific performance where plaintiff's signature on the proposed agreement, alone, was insufficient for contract formation.

¶ 2    This action stems from plaintiff-appellant Matthew Frankenfeld's employment with defendant-appellee Thrive Physical Therapy Partners, LLC. In 2023, plaintiff entered into an employment agreement to serve as Chief Development Officer (CDO) with Thrive, which included the potential for equity compensation through a separate Incentive Award Agreement (Incentive Agreement) that defendant never countersigned. Plaintiff's employment ended in May 2024 without the Incentive Agreement ever being finalized. Plaintiff subsequently filed a complaint against defendants-appellees Thrive Physical Therapy Partners, LLC, Thrive Physical Therapy Partners Holdings, LLC, and Tyree & D'Angelo Partners, LLC, seeking declaratory judgment and specific performance based on the alleged enforceability of the Incentive Agreement. On October 3, 2024, the circuit court granted defendants' motion to dismiss the complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2022)) (Code), finding that no enforceable contract existed because the Incentive Agreement was never executed by both parties and thus, the condition precedent to its formation was not satisfied.

¶ 3    Plaintiff now appeals, arguing that (1) the circuit court erred in holding that the employment offer that he accepted and acted upon did not result in a binding agreement; (2) his complaint stated a legally sufficient claim based on the written Incentive Agreement, performance, and investment; and (3) the circuit court abused its discretion in dismissing the complaint without oral argument or leave to amend. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5                        A. Complaint for Declaratory Judgment

¶ 6    On August 5, 2024, plaintiff filed a two-count complaint against defendants. Count I sought a declaratory judgment that (1) the Incentive Agreement constituted a valid and enforceable contract, and (2) he was entitled to receive 223,000 Class C units representing the time-vesting

tranche because he was terminated without cause. Plaintiff sought specific performance requiring defendants to issue those units. Count II alleged a violation of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 et seq. (West 2022)) for unpaid wages. Attached as an exhibit to the complaint was a copy of the unexecuted Incentive Agreement. The "Offer Letter," referenced in the complaint, was later filed, with leave of court, as impounded.

¶ 7 The complaint generally alleged that, on April 7, 2023, defendants extended an offer of employment to plaintiff for the position of CDO, which included a yearly salary of $250,000, bonus eligibility, and various employment benefits. The offer also included an opportunity for plaintiff to participate in an equity incentive program. Plaintiff accepted the offer the same day and began employment on May 23, 2023.

¶ 8 On June 15, 2023, defendants provided plaintiff with an initial draft of an Incentive Agreement governing the issuance of Class C equity units, which consist of shares that vest over a specified period of continued employment. The parties thereafter engaged in extensive negotiations regarding both the Incentive Agreement and plaintiff's potential purchase of Class B units. The parties agreed that plaintiff would invest $40,000 toward the Class B units.

¶ 9 On December 10, 2023, plaintiff requested modifications to the Incentive Agreement with respect to the Class C units. Specifically, plaintiff requested that the Class C units relating to the time-vesting tranche would immediately vest if he were terminated without cause. Defendants agreed to these changes and, on January 30, 2024, sent plaintiff a revised version of the Incentive Agreement reflecting those terms. The revised Incentive Agreement provided that plaintiff would receive 446,000 Class C units, with half subject to time-based vesting and half subject to performance-based vesting.

¶ 10    Plaintiff signed the revised Incentive Agreement on February 6, 2024, and returned it to defendants via e-mail. Defendants' representative acknowledged receipt of the signed Incentive Agreement and responded that a countersigned copy would be provided but never returned an executed version.

¶ 11    The complaint further alleged that between February 5, 2024, and May 7, 2024, the parties had several meetings regarding plaintiff's purchase of the Class B units previously agreed upon. Defendants informed plaintiff that the previously agreed-upon $40,000 investment was insufficient. They demanded that he instead invest $175,000 in the Class B units by the following week, or they would be reneging on the signed version of the agreement that plaintiff had previously sent to defendants.

¶ 12    The following day, plaintiff declined to agree to the revised terms, and defendants indicated that they would not continue working with him and would not honor the Incentive Agreement.

¶ 13    Plaintiff continued working through May 14, 2024, however, by the time of his return home that evening, his access to the company e-mail and computer had been deactivated, and his final paycheck was prorated. Plaintiff further alleged that he had not resigned from his position and had not previously been disciplined or given a negative performance review.

¶ 14    As plaintiff later consented to the dismissal of Count II of his complaint (wage claim), we need not summarize its substance here.

¶ 15                                B. Motion to Dismiss

¶ 16    On October 3, 2024, defendants filed a combined motion to dismiss plaintiff's complaint pursuant to section 2-619.1 of the Code. Relevant here, defendants sought dismissal of count I under section 2-615, arguing that the Incentive Agreement was not a valid and enforceable contract.

¶ 17    Defendants first argued that execution of the Incentive Agreement by both parties was a condition precedent to contract formation. In support, defendants relied on the offer letter, a copy of which was attached as an exhibit to the motion. Included in the letter is a provision for "Incentive Equity Units," which provided that plaintiff's participation in the equity incentive program was "subject to the execution and delivery of the necessary agreements," and that the issuance of equity units was "subject to the execution and delivery of customary equity award agreements in form approved by Thrive."

¶ 18    Defendants also pointed to the Incentive Agreement itself, which contained signature blocks for both parties and execution language stating, "IN WITNESS WHEREOF, the parties hereto have executed this Incentive Award Agreement." According to defendants, these provisions showed that the parties did not intend for the Incentive Agreement to become binding unless and until it was executed by both sides.

¶ 19    Defendants further argued that plaintiff's own allegations established that this condition was not satisfied. Defendants noted specifically plaintiff's allegation that he signed and returned the Incentive Agreement, but that defendants' representative never returned a countersigned copy. Thus, defendants contended that plaintiff pleaded himself out of court by acknowledging that the event required for contract formation, namely, mutual execution of the Incentive Agreement, never occurred.

¶ 20    Defendants also argued that the Incentive Agreement was unenforceable for a second, independent reason. Section 1(b) of the Agreement provided that, "[a]s a condition precedent to the issuance of the Incentive Units," plaintiff was required to be bound by the LLC Agreement and to "simultaneously execute a Joinder to the LLC Agreement." Defendants asserted that the complaint did not allege that plaintiff executed the joinder or otherwise satisfied this requirement.

Accordingly, defendants argued that, even apart from the company's failure to execute the Incentive Agreement, plaintiff was not entitled to the issuance of the incentive units because he failed to satisfy an express condition precedent to receiving them.

¶ 21   Based on these arguments, defendants maintained that plaintiff failed to state a claim for declaratory judgment or specific performance because the undisputed failure of these conditions precedent precluded the existence of a valid contract as a matter of law, warranting dismissal of count I.

¶ 22   With respect to their motion to dismiss Count II of the complaint pursuant to section 2-619, defendants recounted that plaintiff's claim alleged non-payment of interest owed as a part of his compensation. However, defendants had paid the interest owed. Accordingly, defendants argued that Count II of plaintiff's complaint was moot and should be dismissed.

¶ 23                    C. Plaintiff's Response to Defendants' Motion to Dismiss

¶ 24   In response to defendants' motion to dismiss, plaintiff argued that neither defendants' signature nor his execution of a joinder were conditions precedent because defendants prevented them from occurring and demonstrated their intent to be bound by the Incentive Agreement in several other ways. Plaintiff contended that the provisions cited by defendants related only to performance, not to formation or enforceability, and that defendants improperly relied on the offer letter to impose additional conditions barred by the Incentive Agreement's integration clause. Plaintiff additionally argued that if defendants intended for both parties' signatures to be a condition precedent to the formation of the Incentive Agreement, then defendants could have included such express language in the final Agreement.

¶ 25   Plaintiff alternatively argued that, even if those requirements were conditions precedent, defendants could not rely on their nonoccurrence because defendants themselves prevented them

from happening by withholding a countersigned Incentive Agreement for three months while attempting to "strongarm" him to "agree to pay a significantly increased purchase price for the Class B units." Plaintiff further argued that defendants could not rely on the lack of an executed joinder agreement because they never provided him with it in the first place.

¶ 26     Finally, plaintiff argued that defendants' conduct demonstrated an intent to be bound, noting that defendants accepted his revisions, transmitted a finalized agreement for signature, acknowledged receipt of his signed copy, and retained it while indicating a countersigned version would follow. Plaintiff asserted that such conduct was sufficient to establish mutual assent despite the absence of a formal signature. Accordingly, plaintiff maintained that the complaint adequately alleged a valid and enforceable contract and that defendants' motion to dismiss count I should be denied.

¶ 27     As we noted earlier, plaintiff consented to defendant's motion to dismiss Count II of the complaint (wage payment) pursuant to section 2-619 of the Code.

¶ 28                    D. Defendants' Reply to Plaintiff's Response

¶ 29     Defendants filed a reply in support of their motion to dismiss on November 11, 2024, asserting that plaintiff's response failed to cure the fundamental defect in count I, namely that the conditions precedent to contract formation were not satisfied and no enforceable agreement existed as a matter of law.

¶ 30                    E. Circuit Court's Order

¶ 31     On March 12, 2025, the circuit court issued a written order in which it granted defendants' motion to dismiss count I pursuant to section 2-615 of the Code. Although, as we point out later, our review of the circuit court's judgment in this matter is *de novo*, we have nonetheless reviewed the court's well-reasoned analysis and disposition and find it instructive.

¶ 32    On April 11, 2025, plaintiff filed his notice of appeal.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, plaintiff argues that (1) the circuit court erred in holding that the employment offer that he accepted and acted upon did not result in a binding agreement; (2) his complaint stated a legally sufficient claim based on the written Incentive Agreement, performance, and investment; and (3) the circuit court abused its discretion in dismissing the complaint without oral argument or leave to amend.

¶ 35                              A. Standard of Review

¶ 36    A section 2-615 motion to dismiss challenges the legal sufficiency of the complaint based on defects apparent on its face. (735 ILCS 5/2-615 (West 2022)). "In ruling on a section 2-615 motion all well-pleaded facts and all reasonable inferences that may be drawn from those facts are accepted as true." *iMotorsports, Inc. v. Vanderhall Motor Works, Inc.,* 2022 IL App (2d) 210785, ¶ 13. "The critical inquiry in reviewing a section 2-615 motion is whether the allegations in the complaint, construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted." *Id.* "Thus, only those facts apparent from the face of the pleadings, documents attached to the complaint (including exhibits, depositions, and affidavits), matters of which the court can take judicial notice, and judicial admissions in the record may be considered in ruling on a section 2-615 motion." *Id.* If the attached exhibits contradict the allegations in the complaint, the exhibits prevail, and the allegations are disregarded in evaluating the sufficiency of the pleading. *Id.* A circuit court's order granting a 2-615 motion is reviewed *de novo*. *Id.* Additionally, we may affirm the circuit court's judgment on any basis supported by the record, regardless of the reasoning the court relied upon. *Id.*

¶ 37                    B. Incentive Agreement and Condition Precedent

¶ 38    Before proceeding, we note plaintiff's frequent citation to Delaware law, which, he maintains, "governs the Incentive Award Agreement" and is "designated by the parties in the governing documents." We note that the offer letter, the legitimacy of which is not disputed and which we deem to be one of the "governing documents," expressly provides that its terms and conditions "shall be governed by the internal laws of the state of Illinois." In any case, the question before this court concerns not the substance of the Incentive Agreement, but rather whether such an agreement even exists, a matter which we may determine simply with resort to basic contract principles, regardless of which state's laws apply. For purposes of this analysis, we apply Illinois' decisional law.

¶ 39    In his opening brief, plaintiff first contends that the circuit court erred in holding that a formal employment offer, accepted and acted upon, did not result in a binding agreement. He argues that the circuit court erred in dismissing count I because he sufficiently alleged the existence of a valid and enforceable contract. Specifically, plaintiff contends that the complaint alleged mutual assent and consideration where defendants drafted and transmitted the final Incentive Agreement, plaintiff signed and returned it, defendants acknowledged receipt, and plaintiff performed by relocating, assuming executive responsibilities, and providing financial contributions. Plaintiff further argues that defendants cannot avoid the Incentive Agreement based on their own failure to countersign after accepting the benefits of his performance, and that mutual assent may be established through the parties' conduct and communications, not solely through formal execution.

¶ 40    In response, defendants maintain that execution of the Incentive Agreement was a condition precedent to contract formation and that plaintiff cannot avoid this requirement by relying on conduct or performance. Defendants argue that plaintiff improperly conflates his

acceptance and performance under the signed offer letter with the formation of the separate Incentive Agreement, which remained subject to negotiation and was never executed. Defendants further contend that any performance by the parties, including plaintiff's relocation, employment, and financial contributions, occurred pursuant to the offer letter, not the Incentive Agreement, and that the offer letter expressly conditioned plaintiff's receipt of equity units on "the execution and delivery of customary equity award agreements," which never occurred. Defendants also assert that plaintiff's reliance on conduct-based assent is misplaced because such conduct must relate to the specific agreement at issue, and here, plaintiff's alleged conduct relates only to his employment under the offer letter. Accordingly, defendants maintain that plaintiff failed to allege facts demonstrating mutual assent to the Incentive Agreement and that dismissal of count I was proper.

¶ 41    We agree with defendants that plaintiff appears to conflate the offer letter with the Incentive Agreement and, throughout almost the entirety of his opening brief, treats the offer letter and the Incentive Agreement as though they were one. They are separate agreements, as is clearly evidenced by the express language in the incentive equity provision contained in the offer letter and by the separate writing itself. In fact, the offer letter was signed by both parties. Plaintiff accepted the offer letter by reporting to work, and defendants compensated him for the same. The fact that plaintiff "relocated, assumed executive responsibilities, and transferred substantial funds," are all matters related to plaintiff's acceptance of the offer letter. The sole issue before this court, and the only issue upon which the parties disagree, is whether the Incentive Agreement, standing alone, is enforceable.

¶ 42    Defendants argue that the circuit court correctly held that Thrive Holdings' execution of the Incentive Agreement was a condition precedent to the agreement being a valid and enforceable contract. In his reply brief, plaintiff, now properly focused on the enforceability of the Incentive

Agreement, contends that defendants' condition precedent arguments fails because (1) defendants waived or satisfied any signature requirement and (2) execution was not essential to formation of the agreement.

¶ 43    A condition precedent is an act that must be completed or an event that must occur before a contract takes effect or before a party is obligated to perform under the contract. *In re Estate of Adames,* 2020 IL App (1st) 190573, ¶ 48. "Whether an act is necessary to formation of the contract or to the performance of an obligation under the contract depends upon the facts of the case." *McAnelly v. Graves*, 126 Ill. App. 3d 528, 532 (1982). "A condition goes solely to the obligation of the parties to perform, existence of such a condition does not prevent the formation of a valid contract." *Id*. Whether the text and format of an agreement establish that a signature is a condition precedent to the contract generally depends on the parties' intent, which can be inferred from several factors. *Adames,* 2020 IL App (1st) 190573, ¶¶ 53-54.

¶ 44    In evaluating whether mutual signatures are a condition precedent, courts look at whether the agreement identifies the parties and includes separate signature lines for each party on the last page. *Id*. Courts also consider express language indicating that execution is required, such as provisions stating that a party's signature signifies agreement to the terms, that the agreement becomes effective upon signing, that the parties agree to execute the document, or that it becomes binding only upon the exchange of the required signatures. *Id*.; see also *Calo, Inc. v. AMF Pinspotters, Inc.,* 31 Ill. App. 2d 2, 9 (1961) ("If an offer prescribes the place, time or manner of acceptance[,] its terms in this respect must be complied with in order to create a contract").

¶ 45    Additionally, in assessing whether an unsigned agreement was intended to be binding, courts consider the circumstances surrounding its drafting, not just its text. This includes whether a final version was circulated for approval and signature, whether the parties engaged in follow-

- 11 -

up regarding execution, and whether they treated a signature as necessary to finalize the agreement. *Lynge v. Kunstmann,* 94 Ill. App. 3d 689, 694-95 (1981).

¶ 46    The relevant portions of the Incentive Agreement are as follows:

"This INCENTIVE AWARD AGREEMENT (this "Agreement") is made as of February 2, 2024 by and between Thrive Physical Therapy Partners Holdings LLC, a Delaware limited liability company (the "Company"), and Matthew Frankenfeld (the "Recipient").

Section 1. Issuance.

(b) LLC Agreement. As a condition precedent to the issuance of the Incentive Units to the Recipient, the Company has required that the Recipient be bound by, and the Recipient has agreed to be bound by, the LLC Agreement and the terms and conditions hereof. Without limiting the foregoing, the Recipient has agreed to simultaneously execute a Joinder to the LLC Agreement in a form attached as Exhibit A.

Section 3. Representations and Warranties of the Company. In connection with the issuance of the Incentive Units, the Company represents and warrants to the Recipient as follows:

(c) Authorization; No Breach; Consents. The execution, delivery, and performance by the Company or its officers or managers of this Agreement and the LLC Agreement and the offer and issuance of the Incentive Units hereunder have been duly authorized by the Company. Each of this Agreement and the LLC Agreement constitutes a valid and binding obligation of the Company, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or

other laws affecting creditors' rights generally and limitations on the availability of equitable remedies.

Section 8. Miscellaneous.

(e) Counterparts. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same Agreement. The parties agree that the delivery of executed counterparts may be made by electronic delivery (such as PDF).

(k) Entire Agreement. Except as otherwise expressly set forth in this Agreement, this Agreement and the other agreements referred to in this Agreement embody the complete agreement and understanding among the parties to this Agreement with respect to the subject matter of this Agreement, and supersede and preempt any prior understandings, agreements, or representations by or among the parties or their predecessors, written or oral, which may have related to the subject matter of this Agreement in any way.

IN WITNESS WHEREOF, the parties hereto have executed this Incentive Award Agreement on the date first written above."

¶ 47 Here, the structure and language of the Incentive Agreement demonstrate that the parties contemplated a formally executed document as a prerequisite to enforceability. The Incentive Agreement includes provisions addressing execution, authorization, and delivery, which presuppose that execution must be complete before any binding obligations arise. Specifically, Section 1(b) states: "[a]s a condition precedent to the issuance of the Incentive Units to the Recipient, the Company has required that the Recipient be bound by, and the Recipient has agreed

to be bound by, the LLC Agreement and the terms and conditions hereof." In other words, before plaintiff could receive any equity, he was required to complete an additional step, namely executing the joinder and agreeing to the LLC Agreement's terms. Additional provisions within the Incentive Agreement reinforce this conclusion. Section 3(c) provides that the execution, delivery, and performance of the Incentive Agreement have been duly authorized and that it constitutes a binding obligation, which again presupposes that execution has occurred. Similarly, Section 8(e) contemplates that the Incentive Agreement will be executed in multiple counterparts and become operative upon the exchange of those executed counterparts. Taken together, these provisions show that the parties did not intend to be bound upon preliminary assent or negotiation, but only upon completion of the formal execution process, thereby indicating that mutual execution was required before any contractual obligations arose.

¶ 48    In his reply brief, plaintiff cites *Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill. App. 2d 2 (1961), for the proposition that Illinois courts recognize that contracts may be formed by conduct. He maintains that defendants' conduct here, including "acknowledging receipt of the signed agreement, promising a countersignature, adjusting his salary, and planning co-investment structures, all point to an existing contractual relationship." He further asserts that courts do not require formal execution when the parties' actions demonstrate mutual agreement. Building on this, plaintiff contends that the offer letter's promise of incentive equity units made the Incentive Agreement a natural extension of his employment relationship, such that defendants' conduct was sufficient to establish its enforceability without a formal countersignature.

¶ 49    We note initially that although the offer letter included a provision for incentive equity units, their availability was contingent on the execution and delivery of additional agreements. Further, plaintiff's reliance on *Calo* is misplaced. In *Calo*, the buyer made a written offer to

purchase and rent certain equipment from the seller for use in a bowling alley. *Calo*, 31 Ill. App. 2d at 5. Although the seller never formally signed the purchase order, it accepted an additional deposit, submitted plans and specifications, and supervised the remodeling of the premises. *Id*. at 17. The court held that this conduct constituted sufficient acceptance of the buyer's offer, forming an enforceable contract despite the absence of a formal signature. *Id*. Critically, however, the court also recognized the converse principle: where parties reduce an agreement to writing and make signature a condition precedent to its completion, there is no contract until that condition is satisfied. *Id*. at 8.

¶ 50    That limiting principle controls here. Unlike in *Calo*, where no specific mode of acceptance was prescribed and the seller's conduct unambiguously demonstrated an intent to be bound, the Incentive Agreement here expressly contemplated mutual execution as a prerequisite to enforceability. Further, the conduct plaintiff points to here, namely defendants' acknowledgment of receipt of his signed copy and their indication that a countersigned version would follow, is categorically different from the conduct at issue in *Calo*, where the seller actively performed under the agreement's terms by delivering plans and supervising remodeling. Defendants' communications here reflect little more than the ordinary course of negotiation surrounding an agreement that was never finalized. Accordingly, *Calo* does not support plaintiff's position and, if anything, reinforces the conclusion that where the parties expressly contemplated mutual execution as a condition precedent, no contract is formed until that condition is met.

¶ 51    In his opening brief, plaintiff cites *Landmark Properties Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379 (1988), to argue that "a party may by acts and conduct indicate assent to the terms of a written contract and become bound by its provisions, even though the party

has not signed it." To the extent plaintiff intended that this argument applied, not solely to the offer letter, but also to the separate Incentive Agreement, we address it.

¶ 52    In *Landmark*, the central issue was whether the plaintiffs were bound by an arbitration provision contained in a written agreement they had not signed. *Landmark Properties Inc*., 172 Ill. App. 3d at 383. The court held that the plaintiffs were bound by the agreement despite the absence of their signatures, reasoning that their conduct demonstrated assent because they never rejected the agreement's terms and agreed to provide payment if all services were performed in accordance with the contract. *Id*. The court further found that the plaintiffs acted in accordance with the agreement by communicating under its provisions and invoking its dispute resolution procedures, including initiating mediation and asserting claims under the agreement. *Id*. at 383-84.

¶ 53    This case is materially distinguishable from *Landmark* because the issue here is not whether a provision within an existing contract binds a party, but whether the Incentive Agreement was ever formed at all. Unlike in *Landmark*, plaintiff's conduct relates only to his performance under the separate offer letter, and the record shows the Incentive Agreement remained subject to negotiation and was never executed, leaving no underlying contract to which conduct-based assent can attach.

¶ 54    We find that where the parties expressly contemplated mutual execution as a condition precedent to formation, conduct falling short of that requirement cannot be substituted for the execution the parties themselves deemed necessary. Accordingly, plaintiff's conduct-based arguments do not overcome the fundamental deficiency that defendants never executed the Incentive Agreement and the Agreement therefore never became an enforceable contract.

¶ 55    As he did in the circuit court, plaintiff argues on appeal that defendants waived or satisfied any signature requirement. He maintains that defendants viewed execution as a formality, not as a

"condition of obligation." Plaintiff points out that when he sent his last modified version of the agreement to defendants' representative, the representative acknowledged receipt and indicated that he would have the modified agreement signed. Citing *Jordan v. Busch,* 285 Ill. App. 217 (1936), plaintiff argues that a party cannot hinder a condition precedent and then invoke its non-occurrence as a barrier to the contract's formation. By preventing countersignature, plaintiff argues that defendants waived any condition and satisfied formation requirements.

¶ 56    In *Jordan*, the plaintiff relinquished his interest in a brewery in exchange for monthly installment payments funded solely by the defendants' salaries and dividends derived from their interest in the same brewery. *Jordan*, 285 Ill. App. at 220. The defendants subsequently sold their stock and resigned as officers, thereby eliminating the very source of funds from which payments were to be made. *Id*. at 222. The court held that a promisor cannot escape liability by voluntarily alienating the source of a fund he contractually obligated himself to maintain, and that where a party's own conduct renders performance of a condition impossible, the contract becomes absolute. *Id*. at 225.

¶ 57    *Jordan* is inapposite. In *Jordan*, there was an undisputed, fully executed contract, and the only question was whether defendants could escape their payment obligations by destroying the fund they were contractually obligated to maintain. Here, by contrast, the threshold question is whether a contract was ever formed at all. The principle articulated in *Jordan* presupposes the existence of a binding contract and has no application here because the parties never completed the mutual execution required to bring the contract into existence. Defendants' refusal to countersign reflects a failure of contract formation, not a wrongful effort to avoid an existing obligation, and plaintiff cannot rely on *Jordan* to transform an unexecuted agreement into an enforceable contract.

¶ 58    In sum, plaintiff's waiver argument fails because there is no basis in the record to conclude that defendants waived the requirement of mutual execution or otherwise demonstrated an intent to be bound by the Incentive Agreement. Moreover, as stated above, because mutual execution was a condition precedent to the formation of the Incentive Agreement, and because defendants never executed it, no enforceable contract was formed. Plaintiff cannot cure this deficiency by characterizing defendants' refusal to countersign as a wrongful act, as that refusal was entirely consistent with defendants' position that the parties had not reached a final agreement on the terms. Accordingly, we reject plaintiff's waiver argument.

¶ 59    Plaintiff next argues that defendants' refusal to countersign the Incentive Agreement was not a rejection of contract formation, but rather a breach of an already-enforceable contract. He contends that defendants' repeated assurances that a countersignature was forthcoming demonstrated an intent to be bound, and that their subsequent refusal was the product of bad faith delay and leverage-seeking rather than a genuine rejection of the agreement's terms.

¶ 60    Plaintiff cites *Slay v. Allstate Corp.*, 2018 IL App (1st) 180133, for the proposition that defendants' tactic of bundling the Class B and Class C units and repeatedly telling him to "wait" mirrors the kind of bad faith exercise of contractual discretion condemned in *Slay.* Plaintiff argues that defendants used the delay as a negotiating tool to extract concessions rather than as a genuine denial of the contract's existence.

¶ 61    In *Slay*, an insurance agent brought a breach-of-contract claim after her insurer denied the proposed transfer of her book of business to her husband, allegedly to benefit a competing agent. *Slay*, 2018 IL App (1st) 180133, ¶ 3. The court held that the agent sufficiently pleaded a breach of the implied covenant of good faith and fair dealing, reasoning that the insurer's broad contractual

discretion did not permit it to exercise that discretion in an arbitrary, capricious, or bad faith manner inconsistent with the parties' reasonable expectations. *Id.* ¶ 34.

¶ 62    Unlike *Slay*, however, which involved a party's bad-faith exercise of discretion under an existing, fully executed contract, the threshold issue here is not how defendants exercised their discretion under an enforceable agreement, but whether an enforceable agreement was ever formed at all. Where no contract exists, there is no implied covenant of good faith and fair dealing to breach, and plaintiff cannot invoke *Slay* to circumvent the fundamental deficiency that defendants never executed the Incentive Agreement.

¶ 63    We find that because defendants never executed the Incentive Agreement, there was no binding obligation for defendants to honor and no breach upon which plaintiff can base a claim. Thus, plaintiff's argument that defendants' refusal to countersign constituted a breach rather than a rejection fails, as it rests on the existence of an enforceable contract that never came into formation.

¶ 64    Lastly, plaintiff has forfeited several arguments on appeal for failing to raise them before the circuit court. In particular, plaintiff failed to argue (1) equitable theories of promissory estoppel and unjust enrichment, (2) that the circuit court erred in dismissing his complaint without allowing him to engage in discovery, amend his complaint, or engage in oral argument, and (3) that defendants' issuance of Class C units contradicts their claim that the Incentive Agreement was not enforceable. Upon review of the record, we conclude that plaintiff has forfeited these arguments on appeal by failing to raise them before the circuit court or in his response to defendants' motion to dismiss. See *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 32 (issues not raised in the circuit court are forfeited and may not be raised for the first time on appeal).

¶ 65    Considering the Incentive Agreement's language and structure, together with the parties' negotiations as alleged in the complaint and reflected in the attached exhibits, we conclude that execution by both parties was a condition precedent to the formation of a contract. The record establishes that defendants never executed the Incentive Agreement and that plaintiff did not participate in the equity incentive program. Accordingly, the conditions precedent were not satisfied, and the Incentive Agreement never became enforceable.

### III. CONCLUSION

¶ 66    For the reasons stated, we affirm the judgment of the circuit court.

¶ 67    Affirmed.